## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| BEVERLY MYERS | ) | |
| Plaintiff | ) | |
| | ) | CIVIL ACTION NO: |
| | | 3:02CV1152 (AWT) |
| VS. | ) | |
| | ) | |
| JOHN LAVERTY and | ) | |
| CITY OF HARTFORD, HARTFORD | ) | |
| PUBLIC SCHOOLS | ) | SEPTEMBER 21, 2004 |
| Defendant | | |

### MEMORANDUM OF LAW IN SUPPORT
### OF OBJECTION TO SUMMARY JUDGMENT

**I.    FACTS:**

Plaintiff, Beverly Myers, an African-American woman, brought this action because Defendants discriminated against her on the basis of her race by subjecting her to terms and conditions of employment different from those applied to white employees, have discriminated against her on the basis of her gender, disability and age, and placed her on administrative leave in retaliation for her engaging in protected activities.   Ms. Myers alleges that by engaging in acts of intentional racial discrimination, retaliation and unlawful harassment in the workplace, the defendants have violated her rights under the Civil Rights Act of 1991, 42 U.S.C. §§1981, 1983, 2000e, et seq., 12112, 29 U.S.C. §623 and C.G.S. 46a-60, et seq.

The Plaintiff had been employed as a teacher by the Hartford Public Schools for approximately 27 years.  (Affidavit of Beverly Myers ¶2) Ms. Myers behaved as a professional at all times and is a very experienced teacher. (Affidavit of Taquilaya ¶9) She is over the age of 40, and is in fact over 50 years old. (Affidavit of Beverly Myers ¶2)1 She is in the top salary

1

bracket for her position.(Affidavit of Beverly Myers ¶2)     Defendant John Laverty is the Principal of Batchelder School in the Hartford Public School System (Affidavit of Beverly Myers ¶3) and has personally engaged in, approved, condoned and acquiesced in all retaliatory and racially discriminatory actions material hereto.

On or about November , 2000, the Plaintiff underwent surgery for pilaneal cysts. (Affidavit of Beverly Myers ¶4) On February 2, 2001, the Plaintiff underwent additional surgery on her hand.  (Affidavit of Beverly Myers ¶4)  The surgeries required the Plaintiff to be out of work for approximately 5 months, from November, 2000 to April 9, 2001. (Affidavit of Beverly Myers ¶4) After Plaintiff's return to work, she required special accommodations because she was unable to walk comfortably or climb stairs.  (Affidavit of Beverly Myers ¶4) She also requested time off for physical therapy for her hand.  These accommodations were not made.(Affidavit of Beverly Myers ¶4) Mr. Laverty should have accommodated Ms. Myers while she was attempting to work under a doctor's care. (Affidavit of Taquilaya ¶8)

Upon her return from medical leave, she was subjected to racist comments from students which, despite her complaints to her superiors, went uncorrected by Defendant employer, which made the staff by their default a party to the racism. (Affidavit of Beverly Myers ¶5) In fact, the staff and administration encouraged the students to take action against the Plaintiff. (Affidavit of Beverly Myers ¶5)

Upon Plaintiff's return from medical leave, Plaintiff was unjustly accused and unjustly disciplined three several occasions. Plaintiff was falsely accused of changing the date of return on a doctor's note, or leaving her students unattended when she had to attend a physical therapy appointment, and of encouraging two students to fight. (Affidavit of Beverly Myers ¶7)  These

false accusations lead to placing the Plaintiff on administrative leave and the beginning of termination proceedings.(Affidavit of Beverly Myers ¶7)

The Plaintiff's due process rights were violated in that the pre-disciplinary hearing, held on June 18, 2001, was predetermined as to outcome, and was carried on in an arbitrary and capricious manner.  (Affidavit of Beverly Myers ¶8)   The Plaintiff was placed on administrative leave from her employment on or about August 27, 2001.  (Affidavit of Beverly Myers ¶28 The motive for such action was based on race, age gender or medical disability or a combination of the four.

The manner in which the Plaintiff was placed on administrative leave was designed to humiliate and degrade her.  Her replacement was notified three weeks in advance of the start of school. (Affidavit of Beverly Myers ¶9) However, Ms. Myers was not told that she was being replaced. (Affidavit of Beverly Myers ¶9) Her name was still on the roster for her to sign in. When she came into the building, Mr. Laverty turned red and went to make a phone call. (Affidavit of Beverly Myers ¶9) He did not speak to her.    When the Plaintiff went to the staff room, Ms. Simpson informed her, in the presence of other teachers, that she had been replaced.(Affidavit of Beverly Myers ¶9)

Plaintiff alleges that the following are examples of the racial discrimination that she was subjected to:

Plaintiff was disciplined more often than white teachers.  For example, several white teachers had been more tardy than the Plaintiff, yet she was singled out and described as having the worst tardiness record.  (Affidavit of Beverly Myers ¶10a; Affidavit of Taquilaya ¶7)

Plaintiff was subjected to a harsher work load.  White teachers did not have to cover classes, but Plaintiff was forced to cover other teacher's classes and charged with insubordination if she declined to do so.  Also, out of the three 8th grade homerooms, Plaintiff was assigned the homeroom with the most students and the most male students with behavioral problems two years in a row.  (Affidavit of Beverly Myers ¶10b)

Laverty treated Plaintiff's students differently from white teachers' students.  For example, if the Plaintiff's students were studying the library, Mr. Laverty would ask them who their teacher was.  If they answered "Ms.Myers," he would issue a pass and send the students back out of the library.  White teacher's students were allowed to stay in the library. (Affidavit of Beverly Myers ¶10c) The office staff also treated the Plaintiff's students differently.  For example, when the Plaintiff sent one of her students to the office for pencils, Barbara Dejesus, the Executive Secretary, asked the student who the pencils were for.  When the student replied that they were for the Plaintiff, the Ms. DeJesus sighed "Doesn't she ever sleep?" and refused to give the pencils to the student.   (Affidavit of Beverly Myers ¶10c)

White male teachers were treated differently than Plaintiff.  For example, Plaintiff was subjected to numerous disciplinary actions based on unfounded allegations.  Parents made complaints against Joe Horvath, the while male English teacher, for yelling at the students and the parents wanted to meet with him on June 4, 2002.  The Hartford Courant actually paid a visit to the school to cover this.(Affidavit of Beverly Myers ¶10d) However, Laverty covered up the situation to protect Horvath.(Affidavit of Beverly Myers ¶10d)

The School administration supported the petition against the Plaintiff returning to work. (Affidavit of Beverly Myers ¶10e)

4

When parents made complaints about the Plaintiff, Laverty would set up meetings with the parents and then not inform the Plaintiff what the meeting was about in order for the Plaintiff to be unprepared.  Laverty would fully inform all white teachers of the nature of the meetings with the parents.  (Affidavit of Beverly Myers ¶10f)

Laverty would come in and out of the Plaintiff's classroom to check on her and her whereabouts.  Laverty did not check up on white teachers. (Affidavit of Beverly Myers ¶10g)

The office staff would take down the sign in sheet before the Plaintiff had the opportunity to sign it.  Ms. Hunter, the Vice Principal regularly allowed white teachers to sign in after the sheet was taken down or the administrative staff would sign the teachers in.  (Affidavit of Beverly Myers ¶10h) Some teachers would sign in on the wrong place and would consistently sign in late.  Some of the teachers should have been fired due to their serious tardiness and attendance records.  While Laverty never made is an it an issue for other teachers, he applied undue scrutiny when monitoring the Plaintiff's attendance.  (See Affidavit of Taquilaya ¶7)

White teachers, such as Mr. Horvath and Nora, were regularly allowed to leave school grounds during school hours.  Plaintiff was not allowed to leave school grounds.  (Affidavit of Beverly Myers ¶10i)

Laverty unfairly evaluated the Plaintiff while giving good evaluations to white teachers. After the Plaintiff had been out of work for 5 months due to her medical condition, two weeks later, Laverty did an evaluation of the Plaintiff. (Affidavit of Beverly Myers ¶10j) Laverty chose the class with the most problem kids to observe in an effort to give Plaintiff a poor evaluation. (Affidavit of Beverly Myers ¶10j) On information and belief, other white teachers such as Joe

Horvath who were underperforming as teachers were given outstanding evaluations. (Affidavit of Beverly Myers ¶10j)

Mr. Laverty improperly discussed the Plaintiff with other teachers and attempted to have the other teachers keep an eye on her and monitor her behavior on his behalf. (Affidavit of Taquilaya ¶10) His behavior created a hostile environment and allowed the staff to act in an unprofessional manner to Ms. Myers. (Affidavit of Taquilaya ¶11) He scrutinized the Plaintiff unfairly and encouraged the staff to do the same. (Affidavit of Taquilaya ¶11)

Plaintiff believes that she was subjected to gender discrimination because male teachers were given preferential treatment, in that they were assigned better students and have fewer problem students, they were treated with more respect. (Affidavit of Beverly Myers ¶11) For example, the Science Teacher, Dane, had 14 students and Mr. Terranova had 16. (Affidavit of Beverly Myers ¶11) The Plaintiff was assigned 24 students. (Affidavit of Beverly Myers ¶11) Laverty did not check up on the male teachers as he checked up on Plaintiff, and male teachers were not hassled for their tardiness. (Affidavit of Beverly Myers ¶11)

The Plaintiff believes that she was subjected to disability discrimination in that she was not accommodated for her disability. For example, Plaintiff was to be allowed to use the elevator during fire drills, but a majority of the time, the elevators were not working. (Affidavit of Beverly Myers ¶12a) Plaintiff was supposed to be given a wheelchair to accommodate her, but she was not given one. (Affidavit of Beverly Myers ¶12b) Nor does she recall the note from Mr. Laverty (Exhibit 6 to Deposition of Beverly Myers) purporting to inform Ms. Myers to contact the nurse to order a wheel chair. (Affidavit of Beverly Myers ¶12b) In addition, the nurse never contacted her regarding a wheelchair. (Affidavit of Beverly Myers ¶12b) Her doctor

told the Plaintiff that she should be assigned an assistant to aid her in her classroom, but an assistant was not assigned. (Affidavit of Beverly Myers ¶12c) A teacher or security guard was supposed to be assigned to escort the Plaintiff's students to and from her classroom, since she was unable to do it, but a majority of the time, no escort was provided. (Affidavit of Beverly Myers ¶12d) The Plaintiff was harassed about the date on her doctor's note regarding her return to work.  (Affidavit of Beverly Myers ¶12e) Plaintiff was disciplined because she did not attend a meeting regarding her ability to return to work.(Affidavit of Beverly Myers ¶12f)

In or about early September, 2001, the City of Hartford and the State Board Trustees informed Ms. Myers in writing of their intent to terminate her pursuant to the provisions of Connecticut General Statute ("C.G.S.") §10-151b(b), which provides in relevant part for a trial of the termination request before either a single arbitrator selected by the Board of Education, or by a three member panel, with one arbitrator selected by the teacher, one selected by the Board of Education, and a third person selected neutrally. (Affidavit of Beverly Myers ¶13) Myers elected a three member panel, and appointed Nukilwa Taquilaya. (Affidavit of Taquilaya ¶2; Affidavit of Beverly Myers ¶13) The City of Hartford appointed John W. Romanow. Mark L. Irvings was neutrally chosen and was the Chairperson of the panel. (Affidavit of Taquilaya ¶2; Affidavit of Beverly Myers ¶13)

Hearings were held on May 13 and 14, June 10, 24 and 26, July 15 and September 13, all in the year 2002.   (Affidavit of Taquilaya ¶2)  During such hearings, The State Board of Trustees presented evidence that was incomplete, inaccurate and in some cases shown to be perjured.  (Affidavit of Beverly Myers ¶14) For example, the following issues were addressed at the hearings: a) Tardiness issue was dropped because proven inaccurate because of statistics,

7

known to John Laverty, who perjured himself over the tardiness issue and then recanted on the stand stating that he knew which teachers were regularly more tardy;(Affidavit of Beverly Myers ¶14a)  b) Performance evaluation issues regarding incompetency were dropped because proven not only untrue but deliberately forced into a very short period of time directly following Plaintiff's return from medical leave; (Affidavit of Beverly Myers ¶14b) c) Witness Kathy Murphy said that the Plaintiff's students were in the hallway without supervision on May 2nd at 4th Period, and that it could only have been at that date and time, but Plaintiff proved that her class was being evaluated at that very time on that day by John Laverty with her students all present in her classroom; (Affidavit of Beverly Myers ¶14c)  d) Rhonda Niles testified that she didn't speak to the Plaintiff all year but there was proof that she had spoken to the Plaintiff after Plaintiff sent her a gift after her mother had died;  (Affidavit of Beverly Myers ¶14d) e) Laverty testified that Dorothy Carrigan had a problem working with Plaintiff but Carrigan testified that she had no problem working with the Plaintiff but that she wanted to chair the social studies program and the Plaintiff intimidated her because she knew more about social studies; (Affidavit of Beverly Myers ¶14e) f) Laverty testified that he did not know about the petition that students circulated regarding the Plaintiff until the Thursday morning after Plaintiff returned from medical leave, but Miss Marisol, a paraprofessional, testified that she had spoken to Laverty about it  at about 2:30 or 3:00 pm, on the Friday before Plaintiff returned to school and before Laverty left for Boston (Affidavit of Beverly Myers ¶14f)

The Board of Education was compelled by the Panel to drop one of its charges during the cross-examination of its first witness.(Affidavit of Taquilaya ¶5; Affidavit of Beverly Myers ¶15) On July 15, the panel unanimously required the Superintendent to withdraw the main

charge against the Plaintiff, namely that she should be dismissed based on a negative evaluation of her in May of 2001.  (Affidavit of Beverly Myers ¶15; Affidavit of Taqualaya ¶5.) At the time of the hearing on September 13, 2002, the Board had presented about nine (9) witnesses and had failed to prove anything against Ms. Myers.   (Affidavit of Beverly Myers ¶15; Affidavit of Taquilaya ¶6)

There were numerous inconsistencies with Mr. Laverty's testimony.  For example, Mr. Laverty did not treat all the teachers in the same way.  (Affidavit of Taquilaya ¶7) Some teachers would sign in on the wrong place in the sign in sheet or consistently sign in late.  According to the testimony, some of the teachers should have been fired due to their serious tardiness and attendance records.   (Affidavit of Taquilaya ¶7) While Mr. Laverty never made an issue of it for other teachers, he applied undue scrutiny when monitoring Ms. Myers' attendance. (Affidavit of Taquilaya ¶7)

Because of procedural issues not relevant here, the hearings were discontinued before a decision was rendered by the panel.(Affidavit of Beverly Myers ¶15; Affidavit of Taquilaya ¶24)

## II.    DISCUSSION:

### A.    STANDARD OF REVIEW

Rule 56(c) of the Federal Rules of Civil Procedure provides for the granting of a summary judgment motion if "there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." The purpose of summary judgment is to determine whether a trial will be necessary. "The mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." Anderson v.

Liberty Lobby. Inc., 477 U.S. 242, 247-48 (1986).  However, "[t]he [Plaintiff's] burden of

establishing a prima facie case... is not onerous" Fisher v. Vassar College, 114 F.3d. 1332 (2d.

Cir. 1997) citing Texas Dept. Of Community Affairs v.  Burdine,  450 U.S. 248, 253 (1981).  In

fact, Plaintiff's burden of establishing a prima facie case of discrimination has frequently been

described as "minimal." St. Mary's Honor Center v. Hicks, 509 U.S. 502,  506 (1993).

**B.      THE TITLE VII, ADA AND ADEA CLAIMS SHOULD NOT BE
         DISMISSED BECAUSE THE PLAINTIFF HAS EXHAUSTED HER
         ADMINISTRATIVE REMEDIES.**

The Plaintiff timely brought charges to the CHRO and the EEOC.  On March 22, 2002,

the Plaintiff requested right to sue letters from both the CHRO and the EEOC.  On March 27, the

EEOC responded to Plaintiff, informing her that her request had been sent to the Department of

Justice to issue the right to sue letter.  Running up against the deadline imposed in the CHRO's

Right to Sue letter, the Plaintiff sued and attached the EEOC's March 27, 2002 letter as proof

that the Plaintiff had conformed her actions to exhaust her administrative remedies.  The letter

from the Department of Justice did not arrive.  See Affidavit of Christine E. Corriveau.

The Department of Justice has since been informed of their failure to promptly issue the

right to sue letter.  They corrected their error and issued one on August 18, 2004 attached as

Exhibit 1 to the Affidavit of Christine E. Corriveau.

In Boos v. Runyon, 201 F.3d 178 (2d. Cir 2000), the Plaintiff brought suit before the

EEOC issued its final decision on the case. Shortly after bringing suit, the EEOC issued its final

ruling.   The District Court found that Boos had not exhausted her administrative remedies prior

to bringing suit and dismissed the case.  The Second Circuit reversed, finding no basis for

concluding that Boos alleged failure to wait for a final ruling from the EEOC deprived the

10

district court of jurisdiction to hear the case. The Court found that "the exhaustion requirement, while weighty, is not jurisdictional" *Id.* at 182 and that "the fact that Boos' seeming failure to wait is not a jurisdictional flaw does not mean that we should waive the requirement.  It simply means that we may waive it, in appropriate circumstances." *Id.* at 183.  The case at bar is such an appropriate circumstance.  Ms. Myers did everything in her power to exhaust her administrative remedies, and through an error by the EEOC or the Justice Department, or both, the Right to Sue letter never came.  The Justice Department has corrected the error by issuing a Right to Sue letter, which is attached to the Affidavit of Christine E. Corriveau as Exhibit A.    The Plaintiff has now exhausted her administrative remedies, and her Title VII, ADA and ADEA claims should not be dismissed.

### C.    PLAINTIFF HAS STATED A PRIMA FACIE CLAIM OF ILLEGAL DISCRIMINATION

In order to make out a prima facie case of racial discrimination in the termination of employment in violation of Title VII, a plaintiff is required to adduce some evidence that would permit a factfinder to infer, that the termination occurred under circumstances giving rise to an inference of discrimination. *See generally* McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802 (1973); Norville v. Staten Island University Hospital, 196 F.3d 89, 95 (2d Cir. 1999). Once the plaintiff satisfies his initial, "minimal," burden, *see, e.g.*, St. Mary's Honor Center v. Hicks, 509 U.S. 502, 506 (1993); Windham v. Time Warner, Inc., 275 F.3d 179, 187 (2d Cir. 2001), "the burden of production shifts to the employer `to articulate some legitimate, nondiscriminatory reason for the'" termination, O'Connor v. Consolidated Coin Caterers Corp., 517 U.S. 308, 311 (1996) (quoting McDonnell Douglas, 411 U.S. at 802), supported by admissible evidence "which, if believed by the trier of fact, would support a finding that unlawful discrimination was not the cause of the employment action," Hicks, 509 U.S. at 507 (emphasis omitted). If the employer carries this burden, the burden shifts back to the plaintiff to

demonstrate by competent evidence that "the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination." Texas Department of Community Affairs v. Burdine, 450 U.S. 248, 253 (1981); Windham v. Time Warner, Inc., 275 F.3d at 187. "The ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff," Burdine, 450 U.S. at 253, and if the plaintiff has failed to show that there is evidence that would permit a rational factfinder to infer that the employer's proffered rationale is pretext, summary judgment dismissing the claim is appropriate, see, e.g., Smith v. American Express Co., 853 F.2d 151, 154-55 (2d Cir. 1988).

### 1.    Plaintiff's Prima Facie Case:

"Courts recognize that most discrimination and retaliation is not carried out so openly as to provide direct proof of it. Accordingly, an aggrieved party may use circumstantial evidence to assert a prima facie case of discrimination (or retaliation) by alleging '1) [she] belonged to a protected class; 2) [she] was qualified for the position; 3) [she] suffered an adverse employment action; and 4) the adverse employment action occurred under circumstances giving rise to an inference of discriminatory intent.'" Sanders V. New York City Human Resources Admn., 361 F.3d 749 (2nd Cir. 2004), citing Terry v. Ashcroft, 336 F.3d 128, 138, 141 (2d Cir. 2003).

The Defendants concede that the Plaintiff belongs to a protected class, that she was qualified for the position, and that she suffered an adverse employment action, that she was suspended from her position. The Defendants only contest that her suspension gave rise to an inference of discriminatory intent.

The Plaintiff has a long teaching history with the Hartford Public Schools. During said time, Plaintiff was disciplined more often than white teachers. For example, several white teachers had been more tardy than the Plaintiff, yet she was singled out and described as having the worst tardiness record. (See Affidavit of Taquilaya ¶7)

12

Plaintiff was subjected to a harsher work load than white teachers.  White teachers did not have to cover classes, but Plaintiff was forced to cover other teacher's classes and charged with insubordination if she declined to do so.  Also, out of the three 8th grade homerooms, Plaintiff was assigned the homeroom with the most students and the most difficult students two years in a row.

Laverty treated Plaintiff's students differently from white teachers' students.  For example,  Laverty would send the Plaintiff's students back out of the library if they happened to be studying there.  White teacher's students were allowed to stay in the library.  The office staff also treated Plaintiff's students differently.  When the Plaintiff sent a student to the office for pencils, the Executive Secretary Barbara DeJesus asked who the supplies were for.  When the student replied that they were for the Plaintiff, Ms. DeJesus refused to give the supplies to the student.

White male teachers were treated differently than Plaintiff.  For example, Plaintiff was subjected to numerous disciplinary actions based on unfounded allegations.  Parents made complaints against Joe Horvath, the while male English teacher, for yelling at the students and they wanted to meet with him on June 4, 2002.  The Hartford Courant actually paid a visit to the school to cover this. However, Laverty covered up the situation to protect Horvath.

The School administration supported the petition against the Plaintiff returning to work.

When parents made complaints about the Plaintiff, Laverty would set up meetings with the parents and then not inform the Plaintiff what the meeting was about in order for the Plaintiff to be unprepared.  Laverty would fully inform all white teachers of the nature of the meetings with the parents.

13

Laverty would come in and out of the Plaintiff's classroom to check on her and her whereabouts. Laverty did not check up on white teachers.

The office staff would take down the sign in sheet before the Plaintiff had the opportunity to sign it. White teachers were regularly allowed to sign in after the sheet was taken down or the administrative staff would sign the teachers in.

White teachers were regularly allowed to leave school grounds during school hours. For example, Mr. Horvath and the Special Education Teacher, Nora, would go to Dunkin Donuts to get coffee several times during the course of each day. Plaintiff was not allowed to leave school grounds.

Laverty unfairly evaluated the Plaintiff while giving good evaluations to white teachers. After the Plaintiff had been out of work for 5 months due to her medical condition, two weeks later, Laverty did an evaluation of the Plaintiff. Laverty chose the class with the most problem kids to observe in an effort to give Plaintiff a poor evaluation. On information and belief, other white teachers such as Joe Horvath who were underperforming as teachers were given outstanding evaluations.

All of these instances of differential treatment of Plaintiff give rise to an inference that her suspension occurred under circumstances involving discriminatory intent.

### 2.    Defendant's Reasons for its Decisions are Pretext

The Defendants reasons for terminating the Plaintiff were pretext. In fact, several of the charges against Ms. Myers have already been proven to be untrue or partially untrue. In or about early September, 2001, the City of Hartford and the State Board Trustees informed Ms. Myers in writing of their intent to terminate her pursuant to the provisions of Connecticut General Statute

14

("C.G.S.") §10-151b(b), which provides in relevant part for a trial of the termination request before either a single arbitrator selected by the Board of Education, or by a three member panel, with one arbitrator selected by the teacher, one selected by the Board of Education, and a third person selected neutrally. Myers elected a three member panel, and appointed Nukilwa Taquilaya. The City of Hartford appointed John W. Romanow. Mark L. Irvings was neutrally chosen and was the Chairperson of the panel.

Hearings were held on May 13 and 14, June 10, 24 and 26, July 15 and September 13, all in the year 2002. During such hearings, The State Board of Trustees presented evidence that was incomplete, inaccurate and in some cases shown to be perjured. For example, the following issues were addressed at the hearings: a) The tardiness issue was dropped because proven inaccurate because of statistics, known to John Laverty, who perjured himself over the tardiness issue and then recanted on the stand stating that he knew which teachers were regularly more tardy; b) Performance evaluation issues regarding incompetency were dropped because proven not only untrue but deliberately forced into a very short period of time directly following Plaintiff's return from medical leave; c) Witness Kathy Murphy said that the Plaintiff's students were in the hallway without supervision on May 2nd at 4th Period, and that it could only have been at that date and time, but Plaintiff proved that her class was being evaluated at that very time on that day by John Laverty with her students all present in her classroom; d) Rhonda Niles testified that she didn't speak to the Plaintiff all year but there was proof that she had spoken to the Plaintiff after Plaintiff sent her a gift after her mother had died; e) Laverty testified that Dorothy Carrigan had a problem working with Plaintiff but Carrigan testified that she had no problem working with the Plaintiff but that she wanted to chair the social studies program and

15

the Plaintiff intimidated her because she knew more about social studies;  f) Laverty testified that

he did not know about the petition that students circulated regarding the Plaintiff until the

Thursday morning after Plaintiff returned from medical leave, but Miss Marisol, a

paraprofessional, testified that she had spoken to Laverty about it  at about 2:30 or 3:00 pm, on

the Friday before Plaintiff returned to school and before Laverty left for Boston

The Board of Education was compelled by the Panel to drop one of its charges during the

cross-examination of its first witness. On July 15, the panel unanimously required the

Superintendent to withdraw the main charge against the Plaintiff, namely that she should be

dismissed based on a negative evaluation of her in May of 2001.  (Affidavit of Taquilaya ¶5.) At

the time of the hearing on September 13, 2002, the Board had presented about nine (9) witnesses

and had failed to prove anything against the Plaintiff.  It was clear that the charges against the

Plaintiff are unfounded, and are a mere pretext for discrimination.

### 3.    Plaintiff's evidence is sufficient to support a finding of discrimination.

Plaintiff has proffered a prima facie case and has provided evidence that the employer's

explanation is pretext.  In addition, Plaintiff offers the testimony that other teachers believe that

the Hartford Public School System targets older African American female teachers.  (See

Affidavit of Carter ¶2-4)

The Second Circuit "mandates a case by case approach, with a court examining the entire

record to determine whether Plaintiff could satisfy the ultimate burden of persuading the trier of

fact that the defendant intentionally discriminated against Plaintiff." Schnabel v. Abramson, 232

F.3d 83, 90 (2d. Cir. 2001).  It is the clear targeting of Ms. Myers by Mr. Laverty as to unequal

discipline, unequal work load, unequal monitoring and unequal treatment that supports a finding of discrimination.

####    D.    PLAINTIFF'S HOSTILE WORK ENVIRONMENT CLAIM

In order for a workplace to be deemed hostile, a Plaintiff must prove that the environment "be both objectively and subjectively offensive, one that a reasonable person would find hostile or abusive, and one that the victim did in fact perceive to be so." Faragher v. City of Boca Raton, 524 U.S. 775, 787 (1998).

When Plaintiff returned from work after several months of disability, the atmosphere of Batchelder School was hostile to the Plaintiff, based upon her race, disability, age and gender. The moment she got back, she was confronted with badges and banners telling her she was not wanted there. The Vice Principal, Ms. Hunter, encouraged students to do so, indicating they had a First Amendment right to do so (See Affidavit of Thomas Karpeichik Exhibit 2 (filed with Defendant's Brief)). The encouragement of the administration increased the disrespect of the students.

Then the witch-hunt began in earnest. The Plaintiff supplied a doctor's note to the administration that she would return on April 9th. The Plaintiff has never denied that the note was originally dated April 5th, but has stated that her calendar indicated that there was no school that day. Her claim that the doctor's secretary/nurse changed the note has not been found to be false in any way.

The charges against the Plaintiff kept mounting. Plaintiff successfully fended off the charge that she should be dismissed based on a negative evaluation of her in May of 2001. (Affidavit of Taquilaya ¶5, Affidavit of Myers ¶13b.)   During her termination hearings, on July

15, the Board of Education was compelled by the Panel to drop the charge during the cross-examination of its first witness.

The environment at the Hartford Public School System was hostile in that older, African American female teachers were subjected to more discipline and harsher workloads. Further, their positions were not given the support of the administration. They were targeted for referral to Human Resources more often than younger, Caucasian male teachers. Such an environment can only be deemed hostile.

**E.    PLAINTIFF HAS NOT PLEADED A DUE PROCESS CLAIM**

**F.    PLAINTIFF'S §1981 CLAIM**

The Defendants argue that 42 U.S.C. §1983 "provides the exclusive federal remedy for violation of the rights guaranteed by §1981 when the claim is pressed against a state actor." <u>Jett v. Dallas Independent School District</u>, 49 U.S. 701, 735 (1989).   To date, the 2nd Circuit has not decided the issue.  Plaintiff maintains that <u>Jett</u> is outdated and is no longer be good law. <u>Jett</u> is a decision from the year 1989.  In 1991, the Civil Rights Act was amended and paragraph (c) was added to §1981.  42 U.S.C. §1981 states:

> (c)    **Protection against impairment**
> The rights protected by this section are protected against impairment by nongovernmental discrimination and impairment under color of State Law.

In Section 3 of Pub.L. 102-66, Congress explained the purpose of the 1991 Amendments to the Civil Rights Act:

> **Purposes for the 1991 Amendments:** ...

> 4.    to respond to recent decisions of the Supreme Court by expanding the scope of relevant civil rights statutes in order to provide adequate protection to victims of discrimination.

Thus, the findings in <u>Jett</u> are called into question by the changes to the statute. "Section 1981(c) may be ambiguous as to whether it creates an implied private right of action against state actors under Section 1981, statutorily overruling <u>Jett v. Dallas Independent School District</u>, 491 U.S. 701 (1989), which held that 42 U.S.C. §§1983 provides the exclusive federal remedy against municipalities for violation of the rights set forth in Section 1981(a)." <u>Anderson V. Conboy</u>, 156 F.3d 167 n.19 (2nd Cir. 1998). It is the Plaintiff's position that she has a valid 42 U.S.C. §1981 claim against Laverty in his official capacity, in that the findings in <u>Jett</u> have been statutorily overruled.

### G.    PLAINTIFF'S MONELL CLAIM

The Second Circuit has held that in order for a municipality to be liable under 42 U.S.C. §1983, "a plaintiff is required to plead and prove three elements: (1) an official policy or custom that (2) causes the Plaintiff to be subjected to (3) a denial of a constitutional right." <u>Zahra v. Town of Southold</u>, 48 F.3d 674, 685 (2d Cir. 1995).

"There are three means by which individuals can obtain such policy making authority. They are express, legislative grant, delegation by those to whom the power has been expressly granted, or by 'widespread practice that, although not authorized by written law or express municipal policy, is so permanent and well settled as to constitute a custom or usage with the force of law.'"<u>Ramos v. the City of New York et al</u>, Lexsee 1997 U.S. Dist. Lexis 10538, *citing* <u>City of St. Louis v. Praprotnik</u>, 485 U.S. 112, 126 (1988). Mr. Laverty is the Principal at Batchelder School. As a Principal, it is his custom and duty to report "unusual incidents" to Human Resources. (Affidavit of Beverly Myers ¶6) It is the Plaintiff's belief that Mr. Laverty

reports such "unusual incidents" in an inconsistent manner, designed to focus discipline on older African American female teachers. (Affidavit of Beverly Myers ¶16) This is an official policy or custom that caused the Plaintiff to be subjected to a denial of her constitutional rights - her protected property interest in her tenured position as a teacher.

Upon Ms. Myers' return to school in April, 2001, Mr. Laverty mounted an all-out attack on Ms. Myers. In May, Mr. Laverty gave Ms. Myers poor performance evaluations after years of satisfactory performance. At the termination hearing, the charges regarding the poor evaluation were dismissed against her. When she desperately needed to attend a physical therapy hearing, she attempted to inform the proper officials - Vice Pincipal Hunter or Mr. Laverty. (Affidavit of Beverly Myers ¶7) Ms. Hunter was not in school that day and Ms. Myers was told by the Executive Secretary, BarbaraDeJesus, that Mr. Laverty couldn't be found. (See Affidavit of Myers ¶7) Laverty is now trying to blame the lack of coverage on Ms. Myers. Mr. Laverty also charged Ms. Myers with forging a doctor's note, but Ms. Myers has steadfastly maintained that the doctor's note was altered by the doctor's nurse due to her school calendar.

It was apparent to Mr. Taquilaya, the hearing officer, that Mr. Laverty treated Ms. Myers differently than other teachers and applied undue scrutiny to her behavior. Laverty monitored her attendance record, which he did not do for other teachers, and he even asked other teachers to monitor her behavior, creating a hostile environment for her. (See Affidavit of Taquilaya ¶¶7, 10, 11). Laverty's attack on Ms. Myers amounts to a policy by a school decision-maker - he was after all responsible for reporting unusual incident reports to Human Resources, and he did so with a vengeance against the Plaintiff by monitoring her behavior with undue scrutiny.

**H.    THE CITY OF HARTFORD IS A PROPER DEFENDANT TO THIS ACTION**

The City of Hartford and its "reconstituted" Board of Education is the successor in interest to the State Board of Trustees.  It is fiscally responsible for the actions of the State Board of Trustees. Pursuant to Special Act 01-7, Sec. 3(d), "The City of Hartford shall remain financially responsible for any liabilities or obligations, including contingent liabilities and obligations, incurred by the city council, the Hartford Board of Education prior to June 1, 1997, or the State Board of Trustees for the Hartford Public Schools."

Moreover, the Hartford Board of Education has ratified all past acts of the State Board of Trustees by  accepting their actions against the Plaintiff once the Board of Education regained control.    In addition, the City of Hartford, Hartford Public Schools is a rightful defendant because it has the power to restore the Plaintiff to her former position or to continue the hearing process.  For all of these reasons, the City of Hartford, Hartford Public Schools is a proper Defendant in this matter.

**I.    JOHN LAVERTY IS A PROPER DEFENDANT IN THIS ACTION**

**1.    Mr. Laverty was properly  served and waived his right to contest personal jurisdiction.**

On or about September 5, 2002, Defendants filed a Motion to Dismiss on a variety of grounds, including insufficiency of process, pursuant to Rule 12(b0(5), on behalf of Mr. Laverty. At that time, the 120 days had not run since the filing of the Complaint.  The Plaintiff re-served the Defendant through the Labor Relations Specialist at the Hartford Public Schools, Milly Ramos, who accepted service for Mr. Laverty.  The Court's Endorsement Order found that

"service was made on the[] Defendants within the 120-day time limit period under Federal Rules of Civil Procedure 4(m)."

"The requirement that a court have personal jurisdiction is a due process right that may be waived either explicitly or implicitly." Transaero, Inc. v. La Fuerza Aerea Boliviana, 162 F.3d 724 (2d Cir 1998) *citing* Insurance Corp of Ireland v. Compagnie Des Bauxites De Guinea, 456 U.S. 694, 703-05 (1982). "The actions of the defendant may amount to a legal submission to the jurisdiction of the court, whether voluntary or not." Insurance Corp of Ireland at 704-05. "Thus, when a defendant appears and challenges jurisdiction, it agrees to be bound by the court's determination on the jurisdictional issue." Transaero, *citing* Insurance Corp of Ireland at 706.

In the case at bar, Laverty appeared and agreed to be bound on the Court's decision on the Motion to Dismiss. The Court found that Laverty had been served within the 120 day limit and the court had personal jurisdiction over him.

It appears absurd that the "Labor Relations Specialist" for the Hartford School Board would accept service for an employee and then later attempt to claim that Mr. Laverty was not served.

### 2.    Mr. Laverty is not entitled to qualified immunity

Government officials are shielded by qualified immunity when performing discretionary functions, "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982). In the case at bar, the Defendant is not entitled to qualified immunity because he was aware that he was violating a clearly established constitutional right of Plaintiff's, of which a reasonable person would have known at the time in question. Mr. Laverty's use of his power to target the Plaintiff for unequal discipline in order to deprive her of her constitutionally

22

protected right to a tenured teacher position place him in a position wherein he should not be protected by qualified immunity.

## III.    CONCLUSION

For the foregoing reasons, the Court should deny the Defendant's Motion for Summary Judgment.

<div style="margin-left:40%">

THE PLAINTIFF


By_____
Francis A. Miniter, her attorney
Christine E. Corriveau, her attorney
Miniter & Associates
100 Wells Street Unit 1-D
Hartford, CT 06103
860-560-2590 ct09566/ct21212

</div>

CERTIFICATION

This is to certify that a copy of the foregoing has been mailed to the following counsel of record this ____ day of September, 2004:

Joseph W. McQuade, Esq.

Diana Garfield, Esq.

Kainan Escalera & McHale, PC

21 Oak Street Suite 601

Hartford, CT 06106

<div style="text-align: right;">_____<br>
Francis A. Miniter/Christine E. Corriveau</div>