



UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT

BEVERLY MYERS,

    Plaintiff,

VS.

CITY OF HARTFORD, ET AL.,

    Defendant.

CIVIL ACTION NO.
3:03CV652 (PCD)

January 20, 2004

### DEPOSITION OF NUKILWA TAQUILAYA

    Taken before Sandy K. Visentin, Licensed Professional Reporter and Notary Public in and for the State of Connecticut, pursuant to the Federal Rules of Civil Procedure, at the law offices of Kainen, Escalera & McHale, 21 Oak Street, Hartford, Connecticut, on Tuesday, January 20, 2004, commencing at 9:35 a.m.

Sandy K. Visentin, LSR, RPR
CT Lic. #SHR.234
Andrews Reporting Service
330 Cook Hill Road
Cheshire, CT 06410
(203) 271-2190

<u>APPEARANCES</u>

<u>REPRESENTING THE PLAINTIFF</u>:

    MINITER & ASSOCIATES
    100 Wells Street, Suite 1D
    Hartford, CT   06103
        By:  Christine Corriveau, Esq.

<u>REPRESENTING THE DEFENDANTS</u>:

    KAINEN, ESCALERA & MCHALE, P.C.
    21 Oak Street
    Hartford, CT   06106
        By:  Diana Garfield, Esq.

STATE OF CONNECTICUT    :
                        : ss
COUNTY OF NEW HAVEN     :

    I, SANDY K. VISENTIN, a Registered Professional Reporter and Notary Public duly commissioned and qualified in and for the State of Connecticut, do hereby certify that pursuant to notice there came before me on January 20, 2004, the following-named person to wit: NUKILWA TAQUILAYA, who was by me duly sworn to testify to the truth and nothing but the truth; that he was thereupon carefully examined upon his oath and his examination reduced to writing under my supervision; that this deposition is a true record of the testimony given by the witness.

    I further certify that I am neither attorney nor counsel for nor related to nor employed by any of the parties to the action in which this deposition is taken; and further, I am not a relative or employee of any attorney or counsel employed by the parties hereto, or financially interested in this action.

    IN WITNESS THEREOF, I have hereunto set my hand and affixed my seal this 2nd day of February, 2004.

                                                SANDY K. VISENTIN
                                                LSR, RPR and Notary Public
                                                CT Lic. #SHR.234

My Commission Expires:
August 31, 2006

1  anything.
2      A.  Okay.
3      Q.  I asked you to bring all documents
4  pertaining to fee arrangements for your services in
5  the Section 10-151 proceeding involving Beverly Myers
6  and the City of Hartford, bills sent for your
7  services in that proceeding, and communications
8  relating to your participation in that 10-151
9  proceeding.  So I guess --
10     A.  Well, I have not submitted a bill to
11 Ms. Myers, to be honest with you.  She was under
12 financial hardship.  And that's still the question in
13 my mind based on what has happened, if she's in a
14 position to pay it.
15     Q.  Well, do you have any documents that fit
16 this description; any communications that had you get
17 involved in the proceeding between her and the
18 schools, retention letters asking you to serve on the
19 panel, anything you supplied to her, anything along
20 those lines?
21     A.  No.  We were sworn in as hearing officers
22 at the hearing under oath.  We had to participate --
23 we did participate.
24     Q.  Well, how did you come to be selected to
25 participate in that proceeding?

1   A.  Ms. Myers had the opportunity to have a
2 person to represent her side of the argument.
3   Q.  Had you known her before she asked you?
4   A.  Yes.
5   Q.  And how did you know her?
6   A.  I have known her a little over 25 years.
7   Q.  That's a long time.  As a personal friend
8 or in a professional capacity?
9   A.  Personal friend and a professional.
10  Q.  In what ways did you know her in a
11 professional capacity?
12  A.  She worked in the Hartford school system,
13 and I worked in the state system.
14  Q.  So your paths crossed during both of your
15 careers, is that how it happened?
16  A.  Well, I have attended meetings when she's
17 dealing with a school.  I would visit the school on,
18 I believe, two occasions.
19  Q.  You visited her school while she was
20 teaching?
21  A.  Yes.
22  Q.  In order to do what?
23  A.  No, it was working with the youth.
24  Q.  Okay.
25  A.  You know, she would come to the community

1   professionals and seek out participation working with
2   young people. And she's very active with the youth
3   in the City of Hartford. So being with the Urban
4   League, I found myself working in a certain capacity
5   to help her.
6       Q.   Prior to her asking you, had you ever
7   served on a 10-151 panel?
8       A.   No.
9       Q.   Now that panel had three people on it; you
10  were one of three, correct?
11      A.   Correct.
12      Q.   And you were her representative?
13      A.   Absolutely.
14      Q.   Have you ever been selected as a neutral
15  member of that kind of panel? I guess not if
16  that's --
17      A.   Not in the Hartford school system. I
18  received Affirmative Action training at George Meany
19  Institute in Washington, D.C. as part of my job as a
20  Director of Outreach with the Urban League.
21      Q.   Have you ever done formal arbitrations
22  before?
23      A.   That was the first formal one when we had
24  court stenographers and whatnot.
25      Q.   You mean the one for Mrs. Myers?

1   A.   Yes.
2   Q.   I take it from how you have described
3 things that you are not an American Arbitration
4 Association arbitrator?
5   A.   No.
6   Q.   Are you familiar at all with the rules of
7 the American Arbitration Association for employment
8 cases?
9   A.   I'm familiar with the employment rules of
10 affirmative action and discrimination.
11   Q.   Well, what I was asking you is the American
12 Arbitration Association has specific rules for
13 employment arbitrations and I wondered if you were
14 familiar with them?
15   A.   My experience with the group was my
16 encounter with the panel.
17   Q.   Did you know Attorney Miniter before
18 Ms. Myers asked you to be on the panel?
19   A.   No, I didn't know him.
20   Q.   What did you view as your role as the
21 teacher's, Mrs. Myers', selection for the panel?
22   A.   To be a neutral observer, to assess,
23 witness documents.
24   Q.   Did you view yourself as the teacher's
25 advocate on the panel?

1    A.   No.  I viewed myself as an officer who
2 would listen to testimony and make -- render a
3 decision with two other members.
4    Q.   And you would wait until all of the
5 evidence was in the hearing before you would make a
6 decision?
7    A.   Yes.
8    Q.   Now when you were retained to serve on this
9 panel, was it your understanding that you would
10 receive a fee for your services?
11    A.   Yes.
12    Q.   And was it your understanding that it would
13 be Mrs. Myers that was responsible for payment of
14 your fees?
15    A.   Correct.  Yes.
16    Q.   Was it up to you as to what you would
17 charge?
18    A.   Right.  They have rules for engaging
19 consultants and people who work fee for services, and
20 I worked under those guidelines basically.
21    Q.   And where do those guidelines come from?
22    A.   It's part of the State of Connecticut
23 consultant services.
24    Q.   So it was your understanding when you
25 started that Mrs. Myers would be obligated to pay

1  fees that were established?
2      A.   Right.  I would give her an agreement what
3  she would pay me and how she would pay me.
4      Q.   And did you do that, give her an agreement?
5      A.   Based on what happened, I just held
6  everything because she was under financial hardship.
7  She couldn't pay me.
8      Q.   So prior to your starting out, you didn't
9  have an agreement that you signed before anything
10 commenced?
11     A.   Prior to my starting, I agreed that I would
12 charge so much per hour.
13     Q.   And what was that agreement?
14     A.   That agreement would be $50 an hour.
15     Q.   But there was never any formal document you
16 gave her where she signed?
17     A.   No, because basically I found she was under
18 financial hardship.
19     Q.   So you knew that right from the beginning?
20     A.   Yes.  She was asked to -- I knew she was
21 responsible for paying for the proceeding and she
22 would have to pay for my time.
23     Q.   Well, did you know that she could have
24 opted to have the union represent her at that
25 proceeding?

1  A. That came up in a meeting among the three of us. We had a discussion, the hearing officers.

3  Q. Was that prior to the start of any hearings?

5  A. No, that was the day that the proceeding stopped.

7  Q. Okay. She also could have elected a one-person panel, did you know that?

9  A. No, I did not investigate how the proceeding would be. I just took my position, and I would go in and try to be positive and render a decision on materials and people that have spoke at the hearing.

14 Q. Just so I understand this and it's clear for the record, prior to commencing as the hearing officer, you would have charged her $50 an hour for your time and realized she would be obligated to pay that, but you have elected not to send her a bill for your services?

20 A. If I see where she can, I would do it. But right now she is unemployed and payment stopped. I anticipated that the proceeding would be paid as she had friends paying the chair, which that person would have to receive something like $10,000, I believe. And I opt to wait because I was not under the same

```
 1   guidelines as the attorney.
 2        Q.   So is it your view, then, that if at some
 3   point you believe she's capable of paying you, you
 4   will then submit a bill to her?
 5        A.   Yeah.
 6        Q.   And I guess the bill would encompass at
 7   least the six days of hearings you had and then the
 8   one day, which was when the hearing stopped; is that
 9   what the bill would cover?
10        A.   That day I would not submit a bill because
11   we did not have a hearing.  We just -- well, the
12   chair decided to terminate the proceeding.
13        Q.   Was the decision not to submit a bill to
14   Mrs. Myers your decision, or did she ask you not to
15   do that?
16        A.   That was my decision.  I was made aware
17   that she was paying the chair on an installment
18   basis, which to request my money I saw it as a
19   serious hardship of what they were asking her to pay
20   at the time.
21        Q.   Did you become aware from her telling you
22   or at the proceedings on the 13th, is that when you
23   became aware --
24        A.   That's when I became aware of the financial
25   agreements between her and the chair.
```

1       THE WITNESS:  To my knowledge, I
2   didn't know.  And, like I say, I only was
3   made aware that morning of the arrangement.
4  BY MS. GARFIELD:
5       Q.  Sounds like things got out of hand?
6       A.  You know, we all consider ourselves
7  professional but these two individuals was going at
8  it.  I felt it was beyond repair.
9       Q.  Now, you also submitted an affidavit as
10 part of Mrs. Myers' court case against the City of
11 Hartford, correct?
12      A.  My affidavit was there was some
13 miscommunication.  We did not -- the panel did not
14 agree -- come up with an agreement to terminate
15 Ms. Myers.  We agreed to terminate the hearing.  And
16 some kind of way someone had miscommunicated and the
17 way it was reading was that we had agreed to
18 terminate Ms. Myers but we had only agreed to
19 terminate the hearing.
20      Q.  And why did you think that, that the panel
21 came out with some recommendation to terminate
22 Mrs. Myers?
23      A.  Well, I went to a Board of Ed meeting and I
24 made an appeal on behalf of Ms. Myers that they did
25 not take any action until they had had an opportunity